# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 15, 2022       Decided June 9, 2023

No. 21-5165

GENE CLAYTON SCHAERR,
APPELLANT

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-00575)

———

*Gene C. Schaerr* argued the cause for appellant. With him on the briefs were *Scott D. Goodwin*, *Brian J. Field*, and *Joshua J. Prince.*

*Thomas Pulham*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *H. Thomas Byron, III*, Attorney.

Before: MILLETT and RAO, *Circuit Judges*, and TATEL, *Senior Circuit Judge.*

2

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: Gene Schaerr filed Freedom of Information Act ("FOIA") requests with six intelligence agencies for any records about the unmasking of members of President Trump's campaign and transition team. Schaerr seeks to uncover what he alleges was inappropriate intelligence surveillance for political purposes. Declining to produce any records, the Agencies issued so-called *Glomar* responses, explaining that even the existence or nonexistence of such records was exempted from FOIA. The district court granted summary judgment for the Agencies, concluding that FOIA exempted the information Schaerr requested and that the Agencies had no obligation to search for responsive records before invoking *Glomar*.

We agree. An agency properly issues a *Glomar* response when its affidavits plausibly describe the justifications for issuing such a response, and these justifications are not substantially called into question by contrary record evidence. Because the *Glomar* procedure protects information about even the existence of certain records, an agency need not search for responsive records before invoking it. Here, the Agencies have properly invoked *Glomar* on the grounds that the information Schaerr seeks is protected by FOIA Exemptions One and Three, and nothing in the record suggests the Agencies acted in bad faith in issuing their responses.

I.

A.

In his FOIA requests, Schaerr sought information about foreign surveillance from the Federal Bureau of Investigation ("FBI"), the Office of the Director of National Intelligence ("ODNI"), the National Security Agency ("NSA"), the Central

3

Intelligence Agency ("CIA"), the Department of State ("State"), and the National Security Division of the Department of Justice ("NSD"). In particular, Schaerr requested information about the Agencies' "upstreaming" and "unmasking" practices, which are governed by the Foreign Intelligence Surveillance Act of 1978 ("FISA"). Pub. L. No. 95-511, 92 Stat. 1783 (codified as amended at 50 U.S.C. § 1801 *et seq.*). FISA and its amendments authorize and regulate electronic surveillance through a multi-step intelligence gathering protocol. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402–06 (2013). As relevant here, an agency may not "intentionally target any person … located in the United States" or any "United States person reasonably believed to be located outside the United States." FISA Amendments Act of 2008, Pub. L. No. 110-261, 122 Stat. 2436, 2438 (codified as amended at 50 U.S.C. § 1881a(b)(1), (3)).

When conducting electronic surveillance, agencies employ procedures such as "upstreaming," which collects a target's communications "as they cross the backbone of the internet with the compelled assistance of companies that maintain those networks." When conducting upstream searches, intelligence agencies may incidentally capture information from or about United States persons. In such circumstances, FISA requires agencies "to minimize the acquisition and retention … of nonpublicly available information concerning unconsenting United States persons." 50 U.S.C. § 1801(h)(1); *see also* 50 U.S.C. § 1881a(c)(1)(A). Such minimization procedures must generally conceal the identity of such persons. 50 U.S.C. § 1801(h)(2); *see also* 50 U.S.C. § 1881a(e)(1). Known as "masking," this process requires agencies to substitute the name of a United States person with a generic label, such as "U.S. person 1." Agencies may request unmasking a United States person's identity without his consent only if his identity constitutes "foreign

4

intelligence information," or "is necessary to understand foreign intelligence information or assess its importance." 50 U.S.C. § 1801(h)(2).

B.

In his FOIA requests, Schaerr sought all records concerning the unmasking or upstreaming of 21 individuals from January 1, 2015, to February 1, 2017.[1] The Agencies denied the requests, relying on a "*Glomar* response,"[2] in which they refused "to confirm or deny [their] possession of responsive documents." *People for the Ethical Treatment of Animals v. Nat'l Inst. of Health*, 745 F.3d 535, 540 (D.C. Cir. 2014) ("*PETA*"). A *Glomar* response is lawful if an agency can show that merely divulging the existence or nonexistence of agency records would constitute information covered by a FOIA exemption. *Wolf v. C.I.A.*, 473 F.3d 370, 374 (D.C. Cir. 2007). The Agencies rested their *Glomar* responses on FOIA Exemptions One and Three. FOIA Exemption One excludes from disclosure matters that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and "are in

---

[1] Schaerr's FOIA requests called for all records concerning the unmasking or upstreaming of the following 21 individuals: Steve Bannon, Lou Barletta, Marsha Blackburn, Pam Bondi, Chris Collins, Tom Marino, Rebekah Mercer, Steven Mnuchin, Devin Nunes, Reince Priebus, Anthony Scaramucci, Peter Thiel, Donald Trump, Jr., Eric Trump, Ivanka Trump, Jared Kushner, Sean Duffy, Trey Gowdy, Dennis Ross, Darrell C. Scott, and Kiron Skinner.

[2] A *Glomar* response derives its name from a case in which the CIA "refus[ed] to confirm or deny the existence of records about the *Hughes Glomar Explorer*, a ship used in a classified CIA project." *People for the Ethical Treatment of Animals v. Nat'l Inst. of Health*, 745 F.3d 535, 540 (D.C. Cir. 2014) (cleaned up).

5

fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Exemption Three protects disclosure of matters that are "specifically exempted from disclosure by statute" if the statute "establishes particular criteria for withholding or refers to particular types of matters to be withheld." *Id*. § 552(b)(3).

After his requests were rejected, Schaerr filed suit. The district court granted partial summary judgment to the Agencies, holding that the information sought was protected by FOIA Exemptions One and Three and therefore that the *Glomar* responses were appropriate. *Schaerr v. U.S. Dep't of Just.*, 435 F. Supp. 3d 99, 110 (D.D.C. 2020). The court also held that the Agencies did not have to search for responsive records before issuing their *Glomar* responses and that there was no evidence contradicting the Agencies' affidavits or suggesting they acted in bad faith.[3] *See id.* at 115–16. Schaerr timely appealed.

## II.

An agency may invoke *Glomar* if confirming or denying the mere existence of responsive records would fall within one of FOIA's statutory exemptions. *See* 5 U.S.C. § 552(b)(1)–(9). When an agency invokes *Glomar*, courts can grant summary judgment based on agency affidavits alone. *PETA*, 745 F.3d at 540. An agency is entitled to summary judgment if its affidavits are reasonably specific and are not substantially called into question by contradictory evidence. *See Elec. Priv. Info. Ctr. v.*

---

[3] In addition, the district court held three of the Agencies failed to adequately search for some of the requested documents that were not covered by the *Glomar* response. *See id.* at 128. The parties agreed to dismiss with prejudice the claims decided adversely to the Agencies, so those are not before us. That dismissal rendered the partial grant of summary judgment final and appealable.

6

*Nat'l Sec. Agency,* 678 F.3d 926, 931 (D.C. Cir. 2012) ("*EPIC*").

Schaerr contends the Agencies are not entitled to summary judgment. First, he insists the Agencies must search for responsive records before issuing a *Glomar* response. Second, he claims his request encompassed at least some records not covered by Exemptions One and Three. And finally, he maintains that even if a pre-*Glomar* search is unnecessary and even if all responsive records fall within a FOIA exemption, the Agencies are still not entitled to summary judgment because substantial evidence of bad faith rebuts their affidavits. We find Schaerr's arguments unavailing and affirm the grant of summary judgment to the Agencies.

A.

Schaerr argues the Agencies cannot invoke *Glomar* without searching their records and confirming all the requested information falls within one of FOIA's enumerated exemptions. He maintains that because FOIA permits only "the piecemeal withholding of specifically exempt information," an agency must identify responsive records prior to issuing a *Glomar* response. The Agencies did not search their records, Schaerr says, so their *Glomar* responses cannot justify the withholding of any records.

Schaerr's demand for a record search cannot be reconciled with FOIA, its exemptions, or our cases permitting *Glomar* responses. FOIA requires agencies to make certain records "promptly available" when requested by a member of the public. 5 U.S.C. § 552(a)(3)(A); *see also Cause of Action Inst. v. Off. of Mgmt. & Budget*, 10 F.4th 849, 854 (D.C. Cir. 2021). This public disclosure, however, is limited by essential exemptions that recognize the importance of Executive Branch confidentiality and protect sensitive matters such as national

7

security. *See, e.g.*, 5 U.S.C. § 552(b)(1)(A) (allowing agencies to withhold classified matters in the "interest[s] of national defense or foreign policy").

To invoke a FOIA exemption properly, an agency ordinarily must identify the withheld records and explain the grounds for withholding, thereby confirming that certain records exist. *See, e.g.*, *DiBacco v. U.S. Army*, 795 F.3d 178, 188 (D.C. Cir. 2015). But we have recognized an agency may issue a *Glomar* response and "refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under [a] FOIA exception." *Wolf*, 473 F.3d at 374 (cleaned up). A *Glomar* response is appropriate when merely acknowledging the existence or nonexistence of a particular record would fall within a FOIA exemption. *See EPIC*, 678 F.3d at 931; *Wolf*, 473 F.3d at 374.

Importantly, an agency need not search its records before invoking *Glomar*. We have explained that no search is necessary because "the nature of a *Glomar* response" is to "narrow[] the FOIA issue to the existence of records *vel non*." *Wolf*, 473 F.3d at 374 n.4. In the *Glomar* context, there are "no relevant documents for the court to examine other than the affidavits which explain the Agency's refusal" to confirm or deny the existence of responsive records. *Id*. (quoting *Phillippi v. C.I.A.*, 546 F.2d 1009, 1013 (D.C. Cir. 1976)). An agency need not search for records when simply recognizing the existence or nonexistence of responsive records is protected by a FOIA exemption.

Circuit precedent squarely forecloses Schaerr's claim. The Agencies were not required to search for responsive records because they properly issued *Glomar* responses that cited an applicable FOIA exemption and explained with reasonable specificity the basis for their response.

8

B.

Although the Agencies need not search for records, we must assess whether the Agencies' *Glomar* responses properly invoked FOIA Exemptions One and Three. To determine "whether the existence of agency records *vel non* fits a FOIA exemption," we apply the familiar legal standards for reviewing an agency's reliance on a FOIA exemption. *Id.* at 374. The agency bears the burden of demonstrating a FOIA exemption applies. 5 U.S.C. § 552(a)(4)(B). We review the agency's response *de novo*, affording "substantial weight to an agency's affidavit." *Wolf*, 473 F.3d at 374 (cleaned up). Because withholding national security information is "a uniquely executive purview," we exercise great caution before compelling an agency to release such information. *EPIC*, 678 F.3d at 931 (cleaned up). Consistent with this approach, courts must grant summary judgment for an agency if its affidavit: (1) describes the justifications for nondisclosure with "reasonably specific detail"; and (2) is not substantially called into question by contrary record evidence or evidence of agency bad faith. *Wolf*, 473 F.3d at 374; *see also PETA*, 745 F.3d at 540. An agency's justification is sufficient if it is logical or plausible. *EPIC*, 678 F.3d at 931.

1.

The Agencies rely on Exemption One, which allows the government to withhold matters that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and "are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Recognizing that national security is primarily the province of the Executive, we decline to micromanage agency determinations that such information should remain secret. *See Am. Civil Liberties*

9

*Union v. U.S. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011). When reviewing agency affidavits invoking Exemption One, we simply consider whether the agency has plausibly asserted that the matters are in fact properly classified pursuant to an executive order. *Morley v. C.I.A.*, 508 F.3d 1108, 1124 (D.C. Cir. 2007).

The Agencies all relied on Executive Order 13,526, which allows certain categories of information to be classified when, as relevant here, an "original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and the agency "is able to identify or describe th[at] damage." Classified National Security Information, Exec. Order No. 13,526 § 1.1(a)(4), 75 Fed. Reg. 707, 707 (Jan. 5, 2010).

Each agency provided an affidavit averring the information Schaerr seeks is properly classified under Executive Order 13,526. In their affidavits, the Agencies maintain that confirming or denying the existence of records related to upstreaming or unmasking would damage national security by disclosing agency priorities, capabilities, and methods. Such disclosure would reveal whether the Agencies possess FISA-related intelligence on any of the 21 individuals named in Schaerr's FOIA request. Acknowledging the existence of such records would force the Agencies to disclose how they acquire, retain, and disseminate unmasking and upstreaming requests, "thereby revealing strengths, weaknesses, and gaps in intelligence coverage." And, as the FBI noted, our adversaries could use this information "to develop and implement countermeasures" to avoid future detection.

10

The Agencies have more than plausibly explained why any responsive records would be classified and have provided credible reasons for classifying this information, including that unauthorized disclosure would damage national security and compromise intelligence sources and methods. Schaerr's generalized suggestion that some responsive records might have been improperly classified cannot overcome the substantial weight we afford to agency classification decisions. We conclude the Agencies' *Glomar* responses have properly invoked FOIA Exemption One because they have shown that confirming or denying the existence of the records Schaerr seeks would reveal classified information.

2.

The records Schaerr requests are also covered by Exemption Three, which shields "matters" that are "specifically exempted from disclosure by statute" if that statute "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). In their *Glomar* responses, five of the six agencies relied on the National Security Act of 1947, which "qualifies as a withholding statute under Exemption 3." *C.I.A. v. Sims*, 471 U.S. 159, 167 (1985); *see also DiBacco*, 795 F.3d at 183. The National Security Act provides that "[t]he Director of National Intelligence shall protect intelligence sources and methods." 50 U.S.C. § 3024(i)(1) (2016). It also prohibits the unauthorized disclosure of such sources and methods. *Id.* We have recognized that the mere acknowledgment of intelligence sources and methods may implicate the protections of the Act. *EPIC*, 678 F.3d at 931–32.

As we have already explained, granting Schaerr's request would force the Agencies to reveal potentially sensitive intelligence information, interfering with their "sweeping

11

power to protect [their] intelligence sources and methods" under the Act. *Sims,* 471 U.S. at 169 (cleaned up). Divulging such information is "specifically exempted" under the National Security Act and is therefore shielded from disclosure by FOIA Exemption Three. *See* 5 U.S.C. § 552(b)(3).

C.

Finally, Schaerr maintains the Agencies cannot rely on FOIA Exemptions One and Three because their affidavits are rebutted by substantial evidence of agency bad faith. Schaerr contends the evidence of bad faith forecloses summary judgment for the Agencies based merely on their affidavits.

As we have already explained, our review of *Glomar* responses in the national security context is limited. Agency affidavits enjoy "a presumption of good faith [that] cannot be rebutted by purely speculative claims" of agency malfeasance. *See In re Clinton*, 973 F.3d 106, 113 (D.C. Cir. 2020) (cleaned up). This presumption applies with special force in the national security context, where we give "substantial weight to an agency's affidavit" and will not "second-guess" its conclusions even when they are "speculative to some extent." *Am. Civil Liberties Union*, 628 F.3d at 619 (cleaned up); *see also Dep't of the Navy v. Egan,* 484 U.S. 518, 530 (1988) ("[C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."). Recognizing the Executive Branch's "unique insights into what adverse [e]ffects" may arise from disclosure, we will not ascribe bad faith to an affidavit that plausibly asserts adverse national security consequences. *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009) (cleaned up).

Schaerr's claims cannot succeed under our longstanding precedent. In their affidavits, the Agencies explained that disclosing the existence or nonexistence of any responsive

12

records would contravene Executive Order 13,526 by harming their ability to gather intelligence, protect national security, and conduct foreign affairs. The Agencies further explained that disclosing the existence or nonexistence of any record would damage "intelligence sources and methods" in violation of the National Security Act. 50 U.S.C. § 3024(i)(1). The affidavits adequately justify the Agencies' *Glomar* responses.

Schaerr points to two instances of supposed "agency bad faith." First, he notes former United Nations Ambassador Samantha Power and her staff requested the unmasking of hundreds of persons, many of whom were members of President Trump's campaign and transition team. Second, Schaerr claims the Agencies illegally spied on President Trump's campaign and transition team. Taken together, Schaerr asserts, these past instances of malfeasance suggest the Agencies may be "improperly withholding information."

Each of these allegations is either too generalized or too attenuated from the specific classification decisions at issue to constitute the kind of "tangible evidence of bad faith" we have required to overcome agency affidavits. *Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 393 (D.C. Cir. 1987) (explaining that without such "tangible evidence" "the court should not question the veracity of agency submissions"); *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979) ("The sufficiency of the affidavits is not undermined by a mere allegation of agency misrepresentation or bad faith, nor by past agency misconduct in other unrelated cases."). Schaerr's assertions fall far short of presenting a substantial and material question as to the Agencies' good faith in this case.

* * *

13

The Agencies' affidavits reasonably explain their *Glomar* responses to Schaerr's FOIA requests because even confirming the existence or nonexistence of responsive records is information exempted from FOIA. Our cases make clear the Agencies were not required to search for records before issuing a *Glomar* response. Nor does Schaerr provide evidence of bad faith with respect to the Agencies' FOIA process. The judgment of the district court is thus affirmed.

*So ordered.*